1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JUSTO MORALES,                    )    No. C 10-01199 EJD (PR)
                                  )
              Petitioner,         )
                                  )
       vs.                        )    **ORDER DENYING PETITION FOR**
                                  )    **WRIT OF HABEAS CORPUS;**
                                  )    **DENYING CERTIFICATE OF**
C. NOLL, Warden,                  )    **APPEALABILITY**
                                  )
              Respondent.         )
                                  )
_____    )

Petitioner has filed a <u>pro se</u> Petition for a Writ of Habeas Corpus under 28

U.S.C. § 2254 challenging a judgment of conviction from Monterey County

Superior Court.  Doc. #1.  For the reasons set forth below, the Petition for a Writ of

Habeas Corpus is **DENIED**.

## PROCEDURAL BACKGROUND

In 2006, a jury convicted Petitioner of two counts of second degree murder,

two counts of gross vehicular manslaughter while intoxicated, driving while

intoxicated and causing injury, driving with a .08 percent blood-alcohol level and

causing injury, and hit-and-run driving with serious permanent injury.  The jury

further found that Petitioner personally inflicted great bodily injury on four victims

and fled the scene after committing the offenses.  The state trial court sentenced

1    Petitioner to a determinate term of 10 years with a consecutive indeterminate term of

2    15 years to life.  Doc. #32;  People v. Morales, No. H030193, 2009 WL 1227954

3    (Cal. Ct. App. May 6, 2009).  The state appellate court affirmed the judgment on

4    May 6, 2009 and the California Supreme Court denied review on July 22, 2009.[1]

5    Doc. ## 32 & 33.  Petitioner filed the instant federal habeas petition on March 23,

6    2010.  See Doc. #1.

7                                          **DISCUSSION**

8    A.      Factual Background

9            The facts of Petitioner's underlying offenses were summarized in the state

10   appellate court's opinion:

11                   On December 2, 2004, around 8:15 p.m.,
             [Petitioner] drove his large SUV southbound on
12           Highway 101.  A number [of] people saw him driving
             and called 911 to report him.  Cecilia Acuna and Ester
13           Almanza testified that [Petitioner] was weaving between
             lanes and on and off the right shoulder going over 80
14           m.p.h. and forcing cars to the shoulder.  Manuel Roque
             testified that at one point, [Petitioner] moved from left to
15           right, narrowly missing his truck, and then drove onto
             the right shoulder, hit a temporary road sign, and
16           continued on.  Nick Rocha testified that at another point,
             [Petitioner] forced him off the side of the freeway.  He
17           followed [Petitioner] from a few car lengths back and
             flashed his lights.  However, [Petitioner] swerved,
18           almost running another car off the road, and then exited
             the freeway.  He then drove up an embankment, backed
19           down, and reentered the freeway, going even faster.
             Acuna testified that [Petitioner] came up so close to her
20           that she had to swerve onto the shoulder to avoid being
             hit.  She said [Petitioner] did the same thing to the car in
21           front of her.  Anthony Bayne testified that [Petitioner]
             scraped the side of his car as Bayne tried to avoid him.
22           [Petitioner] then continued down the freeway, swerving
             from one side to the other.
23
                     Sylvia Villanueva was also on the freeway in her
24           minivan, driving her three daughters, Maria, Catalina,
             and Elizabeth, and her mother in law, Josephina Rocha.
25           She was in the right lane.  At one point, she noticed

26   _____

27           [1]Petitioner also filed a petition for writ of habeas corpus in the state appellate
     court, in which he claimed his attorney rendered ineffective assistance of counsel.
28   The state appellate court rejected Petitioner's claim in a separate order.  Doc. #32 at
     2, n.2.

United States District Court
For the Northern District of California

[Petitioner] weaving and quickly approaching her from behind.  He passed her so closely on the left that she had to move farther to the right.  Then the truck in front of her almost went off the road.  Some time later, she saw [Petitioner's] SUV again approaching her from behind at around 85 m.p.h.  [Petitioner] swerved over to the center divider and then swerved back into the right lane, hitting Villanueva's van and causing it to skid and roll over.  Josephina and Catalina were immediately ejected and killed; Maria was ejected and suffered near fatal injuries; Sylvia and Elizabeth were stuck inside the minivan.  Sylvia was hospitalized for four days with a cerebral contusion and arm injury.

As a result of the collision, [Petitioner] lost control of his SUV, and it rolled across the freeway and through a fence, landing upside down on a frontage road.  [Petitioner] climbed out of the SUV and then looked around.  He immediately fled the scene.  At a nearby gas station, Cecilia Mendoza, the attendant, saw [Petitioner] come in.  She remarked that his head was bleeding and asked if he was okay.  He said he was okay and left.  Mendoza called the police.  Outside the station, at [Petitioner's] request, Mendoza gave him her phone, but he handed it back, and she called his wife, whom he spoke to for a while.

A short time later, [Petitioner] told California Highway Patrol (CHP) Officer Peter Aguilar that he had come to the gas station after an accident.  They returned to the frontage road, where CHP Officer Craig Jackson spoke to [Petitioner].  Officer Jackson observed that [Petitioner] was disoriented, his head was lacerated, his speech was slightly slurred, his eyes were red, and he smelled of alcohol.  [Petitioner] said that he left work at 4:00 p.m., fell asleep, and woke up after the accident.  However, he said that he had slept over seven hours the night before. He denied that he had been drinking. He was then arrested.

[Petitioner's] blood was drawn at 11:15 p.m., and tests revealed a blood-alcohol level of .13 percent and the presence of the active ingredient in marijuana.  A forensic toxicologist opined that [Petitioner] had used marijuana roughly around the time of the accident, two to three hours before his blood was drawn.  He further testified that marijuana can cause driving errors, and the combination of marijuana and alcohol intensifies the intoxicating effect of both, slowing reaction time, making it difficult to maintain a constant speed, and causing weaving.

The prosecution introduced evidence of [Petitioner's] prior driving record.  In particular, [Petitioner] had two prior convictions for driving under

the influence (DUI) in August and October 1990, when he was around 18 years old. His license was suspended until March 2000, and he was convicted of driving with a suspended license in August 1996 and April 1998. Starting in May 1998, [Petitioner] participated in a jail DUI program. In July 1998, after his release, he enrolled in an 18-month multiple-DUI program, which he completed in February 2000. That program reviewed the statistics concerning alcohol-related accidents resulting in injury or death, instructed on the correlation between blood-alcohol levels and driving impairment, warned that impairment intensifies when alcohol and marijuana are combined, and cautioned that alcohol impairs judgment and that bad judgment leads to fatal accidents. [Petitioner's] driving privileges were reinstated in March 2000. However, because he had been convicted of driving with a suspended license earlier that March, his license was suspended again. In February 2001, the Department of Motor Vehicles (DMV) advised him that he had been deemed a "negligent operator" and suspended his license until September 2001. Thereafter, [Petitioner] regained his driving privileges, and, on the day of the accident, he had a valid license.

Irma Rodriguez, [Petitioner's] wife, testified that their five-year-old son suffers from severe birth defects and mental and physical disabilities. He has recurrent, potentially life-threatening seizures. Together she and [Petitioner] administer medication to control the seizures. She testified that on December 2, 2004, their son showed seizure symptoms, she administered some medication, and then called [Petitioner], who usually got off work around 4:00 p.m. and was back home between 6:00 or 6:30 p.m. She could not recall when she called, saying it could have been 4:30, 5:30, or even 6:00 p.m.; but she said it was already dark outside. He did not answer, and she left a message on his cell phone. After some time – she could not say how long – [Petitioner] returned her call. He sounded normal and sober and did not mention where he was. She told him to return quickly because she feared their son would have another seizure. He said he was coming. Later, he called from the service station and told her about the accident.[2]

_____

[2] In an interview with Heather Hardee, an investigator for the prosecution, Rodriguez said that on the day of the accident, she called [Petitioner] at noon, 2:00 p.m., and 4:30 p.m. and left messages each time. However, at trial, Rodriguez said she called him 9:00 a.m. and noon.

According to Hardee, Rodriguez further said that [Petitioner] called her back within five minutes of her 4:30 call. At that time, she was frantic and said that their son was having a seizure. He calmed her down, advised her to administer his medication, and said everything would be all right. Rodriguez said that [Petitioner] called again around 5:00 p.m. and said he was on his way home. The next time she spoke to him, he said there had been an accident. She thought he was joking

1

> Contrary to what [Petitioner] told [] Officer
> Jackson, Rodriguez testified that he did not sleep for
> seven hours the night before the accident.

2

3    Doc. #32 at 2–5 (footnote in original, renumbered).

4    B.    <u>Standard of Review</u>

5           This Court may entertain a petition for a writ of habeas corpus "in behalf of a

6    person in custody pursuant to the judgment of a State court only on the ground that

7    he is in custody in violation of the Constitution or laws or treaties of the United

8    States." 28 U.S.C. § 2254(a).  The writ may not be granted with respect to any

9    claim that was adjudicated on the merits in state court unless the state court's

10   adjudication of the claim:  "(1) resulted in a decision that was contrary to, or

11   involved an unreasonable application of, clearly established Federal law, as

12   determined by the Supreme Court of the United States; or (2) resulted in a decision

13   that was based on an unreasonable determination of the facts in light of the evidence

14   presented in the State court proceeding."  <u>Id.</u> § 2254(d).

15          "Under the 'contrary to' clause, a federal habeas court may grant the writ if

16   the state court arrives at a conclusion opposite to that reached by [the Supreme]

17   Court on a question of law or if the state court decides a case differently than [the]

18   Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529

19   U.S. 362, 412–13 (2000).  The only definitive source of clearly established federal

20   law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the

21   Supreme Court as of the time of the state court decision.  <u>Williams</u>, 529 U.S. at 412;

22   <u>Brewer v. Hall</u>, 378 F.3d 952, 955 (9th Cir. 2004).  While circuit law may be

23   "persuasive authority" for purposes of determining whether a state court decision is

24   an unreasonable application of Supreme Court precedent, only the Supreme Court's

25   holdings are binding on the state courts and only those holdings need be

26   "reasonably" applied.  <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir.2003),

27

28   because he was so calm.  He asked to talk to his father because he needed a ride.

United States District Court

For the Northern District of California

1    overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003). Even if the

2    state court decision was either contrary to or an unreasonable application of clearly

3    established federal law, within the meaning of AEDPA, habeas relief is still only

4    warranted if the constitutional error at issue had a "'substantial and injurious effect

5    or influence in determining the jury's verdict.'"   Penry v. Johnson, 532 U.S. 782,

6    795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

7         "Under the 'unreasonable application' clause, a federal habeas court may

8    grant the writ if the state court identifies the correct governing legal principle from

9    [the] Court's decisions but unreasonably applies that principle to the facts of the

10   prisoner's case." Williams, 529 U.S. at 413.  "[A] federal habeas court may not

11   issue the writ simply because that court concludes in its independent judgment that

12   the relevant state-court decision applied clearly established federal law erroneously

13   or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A

14   federal habeas court making the "unreasonable application" inquiry should ask

15   whether the state court's application of clearly established federal law was

16   "objectively unreasonable." Id. at 409.  The federal habeas court must presume

17   correct any determination of a factual issue made by a state court unless the

18   petitioner rebuts the presumption of correctness by clear and convincing evidence.

19   28 U.S.C. § 2254(e)(1).

20        In three decisions issued last term, and again in a decision issued this term,

21   the Supreme Court vigorously and repeatedly affirmed that under AEDPA, there is a

22   heightened level of deference a federal habeas court must give to state court

23   decisions.  See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington

24   v. Richter, 131 S. Ct. 770, 783–85 (2011); Premo v. Moore, 131 S. Ct. 733, 739–40

25   (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam).  As the Court

26   explained:  "[o]n federal habeas review, AEDPA 'imposes a highly deferential

27   standard for evaluating state-court rulings' and 'demands that state-court decisions

28   be given the benefit of the doubt.'"  Felkner, 131 S. Ct. at 1307 (citation omitted).

1    With these principles in mind regarding the standard and limited scope of review in

2    which this Court may engage in federal habeas proceedings, the Court addresses

3    Petitioner's claims.

4    C.    Claims and Analysis

5          Petitioner raises the following grounds for federal habeas relief by

6    referencing the state appellate court decision in his direct appeal:  (1) the trial court

7    erred in admitting evidence of his prior driving record, thereby violating Petitioner's

8    right to due process; (2) the trial court erroneously instructed the jury on assumption

9    of the risk and misinstructed on the defense of voluntary intoxication, the knowledge

10   element of hit-and-run driving, and the required concurrence of act and mental state;

11   (3) the trial court erred in refusing Petitioner's requested instruction defining implied

12   malice; and (4) the trial court erred in imposing an upper term for driving while

13   intoxicated.  See Doc. #1 at 6; Doc. #1-1.  Each claim is analyzed in turn below.

14       1.    Alleged Due Process Violation due to Admission of Prior Driving
                 Record

15

16         Petitioner claims his right to a fundamentally fair trial was violated by the

17   trial court's erroneous admission of evidence of his prior driving record which

18   Petitioner argues is irrelevant.  Specifically, Petitioner contest the admission of his

19   two 1990 DUI judgments, three convictions for driving with a suspended license

20   (received in August 1996, April 1998, and March 2000), the February 2001

21   administrative decision to suspend his license as a negligent operator for a minor

22   moving violation, and evidence of his participation in DUI counseling programs in

23   May and July of 1998.

24         The relevant background information regarding Petitioner's claim, as set

25   forth in the state appellate court opinion, is as follows:

26                Before trial, the prosecutor sought the admission
           of 11 items related to [Petitioner's] driving record,
27         arguing they were relevant to prove implied malice, and
           in particular, [Petitioner's] knowledge at the time of the
28         accident that driving under the influence was dangerous.

United States District Court

For the Northern District of California

1

2

3

4

5

        The court agreed to admit the two 1990 DUI convictions, three of five convictions for driving with a suspended license, an administrative decision to suspend his license as a negligent operator for some minor moving violation, and evidence of [Petitioner's] participation in DUI counseling programs.  The court excluded two prior convictions for driving with a suspended license and two prior convictions for speeding.

6

    . . . .

7

8

9

10

11

12

13

14

15

        The prosecution introduced evidence of his prior driving record.  In particular, [Petitioner] had two prior convictions for driving under the influence (DUI) in August and October 1990, when he was around 18 years old.  His license was suspended until March 2000, and he was convicted of driving with a suspended license in August 1996 and April 1998.  Starting in May 1998, [Petitioner] participated in a jail DUI program.  In July 1998, after his release, he enrolled in an 18-month multiple-DUI program, which he completed in February 2000.  That program reviewed the statistics concerning alcohol-related accidents resulting in injury or death, instructed on the correlation between blood-alcohol levels and driving impairment, warned that impairment intensifies when alcohol and marijuana are combined, and cautioned that alcohol impairs judgment and that bad judgment leads to fatal accidents.

16

Doc. #32 at 4, 6.

17

       a.    <u>Standard</u>

18

19

20

21

22

23

24

25

26

27

    The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ [of habeas corpus.]"  <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).  Therefore a state court's evidentiary ruling may only be addressed in a federal habeas action if a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  <u>Henry v. Kernan</u>,

28

United States District Court

For the Northern District of California

1    197 F.3d 1021, 1031 (9th Cir. 1999).  But "[b]eyond the specific guarantees

2    enumerated in the Bill of Rights, the Due Process Clause has limited operation.

3    [The Supreme Court therefore has] defined the category of infractions that violate

4    'fundamental fairness' very narrowly."  Dowling v. United States, 493 U.S. 342, 352

5    (1990).  "A habeas petitioner bears a heavy burden in showing a due process

6    violation based on an evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172

7    (9th Cir. 2005), amended on reh'g, 421 F.3d 1154 (9th Cir. 2005).

8         The due process inquiry in federal habeas is whether the admission of

9    evidence was arbitrary or so prejudicial that it rendered the trial fundamentally

10   unfair.  Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).  The admission of

11   evidence violates due process only if there are no permissible inferences that the jury

12   may draw from the evidence.   Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir.

13   1991).  Even if the evidence was erroneously admitted, there is a due process

14   violation only if "the erroneously admitted evidence was of such quality as

15   necessarily prevents a fair trial" and that the evidence did, in fact, prevent a fair trial.

16   McKinney v. Rees, 993 F.2d 1378, 1384 (9th Cir. 1993) (internal citations and

17   quotations omitted) (finding it highly probable that the erroneously admitted

18   evidence substantially and injuriously affected the jury's verdict where case against

19   petitioner was solely circumstantial and erroneously admitted evidence was

20   pervasive throughout the trial).

21        Therefore, although admission of evidence of prior crimes or bad acts may

22   violate due process, see Marshall v. Lonberger, 459 U.S. 422, 438–39 n.6 (1983);

23   Fritchie v. McCarthy, 664 F.2d 208, 212 n.1 (9th Cir. 1981) (citing Spencer v.

24   Texas, 385 U.S. 554, 561 (1967)), the admission of the challenged evidence must

25   have "so infected the entire trial that the resulting conviction violates due process" to

26   warrant federal habeas relief, Estelle v. McGuire, 502 U.S. 62, 72 (1991) (citations

27   omitted); see also Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal, 926 F.2d at

28   919–20.  Accordingly, a federal court cannot disturb on due process grounds a state

1  court's decision to admit evidence of prior crimes or bad acts unless the admission

2  of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally

3  unfair.  See Walters, 45 F.3d at 1357; Colley v. Sumner, 784 F.2d 984, 990 (9th Cir.

4  1986).

5            b.      Analysis

6        Petitioner argued on appeal that the admission of his prior driving record

7  rendered his trial fundamentally unfair and warranted reversal.  Doc. #32 at 6.  The

8  state appellate court rejected Petitioner's claim as it pertained to his two prior 1990

9  DUI convictions and his participation in DUI counseling programs, finding that this

10  evidence was both relevant and more probative than prejudicial:

11         In People v. Watson (1981) 30 Cal.3d 290

12  (Watson), the California Supreme Court held that a
   defendant charged with killing another while driving

13  under the influence may be convicted of second degree
   murder based on a finding of implied malice, that is, a

14  finding that the defendant deliberately performed an act,
   the natural consequences of which are dangerous to life,

15  *knowing that the conduct endangers the life of another*,
   but acting with conscious disregard for that risk of life.

16  (Id. at pp. 296-297.)  "'One who willfully consumes
   alcoholic beverages to the point of intoxication, knowing

17  that he thereafter must operate a motor vehicle, thereby
   combining sharply impaired physical and mental

18  faculties with a vehicle capable of great force and speed,
   reasonably may be held to exhibit a conscious disregard

19  of the safety of others.'"  (Id. at pp. 300-301.)

20         Under Evidence Code section 1101, subdivision
   (a), the evidence of [Petitioner's] prior driving record

21  was not admissible to prove his bad character or
   propensity to break the law.  However, in general,

22  evidence of prior misconduct is admissible to prove a
   defendant's subjective knowledge and awareness.  (Id.,

23  subd. (b).)  Thus, in DUI cases, where the defendant is
   charged with second degree murder, courts routinely and

24  properly admit evidence of prior driving conduct to
   show that the defendant knew that drunk driving was

25  dangerous and thus prove implied malice.  (See, e.g.,
   People v. Ortiz (2003) 109 Cal.App.4th 104, 116; People

26  v. Brogna (1988) 202 Cal.App.3d 700, 706-710; People
   v. McCarnes (1986) 179 Cal.App.3d 525, 532-533

27  (McCarnes); People v. Eagles (1982) 133 Cal.App.3d
   330, 340.)

28         [Petitioner] suggests that his prior DUI

**United States District Court**

For the Northern District of California

1   convictions may show his knowledge that driving under
2   the influence was illegal, but they do not show his
    knowledge that it was *dangerous*.

3       In <u>McCarnes</u>, <u>supra</u>, 179 Cal.App.3d 525, the
4   court rejected the same argument.  "[T]he reason that
    driving under the influence is unlawful is *because* it is
5   dangerous, and to ignore that basic proposition,
    particularly in the context of an offense for which the
6   punishment for repeat offenders is more severe
    [citations] is to make a mockery of the legal system as
7   well as the deaths of thousands each year who are
    innocent victims of drunken drivers.  [¶]  Moreover,
8   included in the evidence of two of [Petitioner's]
    convictions, as shown to the jury, was the sentence that
9   he enroll in and complete a drinking driver's education
    program.  Even if we assume [Petitioner] did not realize
10  after his *convictions* that it was dangerous to drink
    alcohol and drive, surely realization would have
11  eventually arrived from his *repeated* exposure to the
    driver's educational program.  To argue otherwise is
12  little short of outrageous."  (<u>Id.</u> at p. 532, italics in
    original.)

13      Similarly, in <u>People v. Brogna</u>, <u>supra</u>, 202
14  Cal.App.3d 700, the court explained that the very act of
    drinking and driving "creates the risk that an intoxicated
15  driver will perform or omit to perform an act which
    proximately causes another's death."  (<u>Id.</u> at p. 709, fn.
16  omitted.)  "One who drives a vehicle while under the
    influence after having been convicted of that offense
17  knows better than most that his conduct is not only
    illegal, but entails a substantial risk of harm to himself
18  and others."  (<u>Ibid.</u>)  Citing <u>McCarnes</u>, the court opined,
    that "driving under the influence constitutes a criminal
19  offense precisely because it involves an act which is
    inherently dangerous.  [Citation.]  That simple fact has
20  been made well known to all segments of our society
    through virtually every form of mass media.
21  Considering today's heightened level of public
    awareness, we cannot believe that any person of average
22  intelligence who has suffered a 'drunk driving'
    conviction would be oblivious to the risks caused by
23  driving while intoxicated."  (<u>Ibid.</u>; <u>accord</u>, <u>People v.
    Ortiz</u>, <u>supra</u>, 109 Cal.App.4th 115-116.)

24      [Petitioner] criticizes these cases, arguing that
25  they apply an objective test – i.e., persons with DUI
    convictions *should* know that drunk driving is dangerous
26  – to find the actual knowledge of that fact.  However, in
    <u>Watson</u>, <u>supra</u>, 30 Cal.3d 290, the court explained that
27  where a defendant has consumed enough alcohol to raise
    his blood alcohol content to a level which would support
28  a finding that he was legally intoxicated and has driven
    his car to the establishment where he had been drinking,

it could be presumed that he knew he would have to drive again later and "was aware of the hazards of driving while intoxicated.... 'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others." (Id. at p. 301, quoting Taylor v. Superior Court (1979) 24 Cal.3d 890, 897.)

We further note that [Petitioner's] DUI convictions were relevant because they established that he knew drunk driving was illegal, if not dangerous, and also that he knew his convictions had, in part, led to DUI counseling programs that focused on the dangers of drunk driving. As in McCarnes and numerous other cases, [Petitioner's] DUI convictions and the programs he completed together have a strong tendency to show that he appreciated the dangers of driving under the combined influence of alcohol and marijuana. (E.g., People v. Ortiz, supra, 109 Cal.App.4th at pp. 108-109; People v. Garcia (1995) 41 Cal.App.4th 1849, 1837, disapproved on other grounds in People v. Sanchez (2001) 24 Cal.4th 983, 991, fn. 3; People v. Autry (1995) 37 Cal.App.4th 351, 355; People v. Johnson (1994) 30 Cal.App.4th 286, 290-292; People v. Talamantes (1992) 11 Cal.App.4th 968, 971-972; People v. David (1991) 230 Cal.App.3d 1109, 1115; People v. Murray (1990) 225 Cal.App.3d 734, 738-739, 746; People v. Ricardi (1990) 221 Cal.App.3d 249, 253-254; People v. Brogna, supra, 202 Cal.App.3d at pp. 704-705; People v. McCarnes, supra, 179 Cal.App.3d at p. 532.)

[Petitioner] claims, however, that the evidence of his DUI counseling programs was irrelevant because he completed them so long before the accident. He argues that whatever he may have learned in the programs about his level of impairment in 1990 had no tendency to show that he understood the danger of his impairment in 2004. We are not persuaded.

We acknowledge that under certain circumstances, remoteness may render a defendant's prior conduct irrelevant for certain purposes. (E.g., People v. Thomas (1978) 20 Cal.3d 457 [evidence defendant molested one daughter 10 years before instant offense found too remote to be relevant to prove a common plan or scheme to molest all of his daughters], implicitly disapproved in People v. Thompson (1980) 27 Cal.3d 303, 317; see People v. Tassell (1984) 36 Cal.3d 77, 89, fn. 8, overruled on other grounds in People v. Ewoldt (1994) 7 Cal.4th 380, 401 [recognizing disapproval].) However, as [Petitioner] acknowledges,

> remoteness usually affects only the weight to be given evidence and not its admissibility.  (People v. Caitlin (2001) 26 Cal.4th 81, 172.)
>
> None of the numerous cases cited above suggests the admissibility of evidence of DUI programs hinges on its temporal proximity to the accident in question. Indeed, in People v. Johnson, supra, 30 Cal.App.4th 286, evidence that the defendant attended a DUI program 12 years before his accident was found relevant and admissible. (Id. at pp. 280-290.)  Here, [Petitioner] started his 18-month program in 1998 and completed it in 2000.  He committed his offenses in December 2004. Moreover, we consider it absurd to suggest that between 1998 and 2000, [Petitioner] was not thoroughly inculcated with the simple, if not obvious and self-evident, fact that driving under the influence is dangerous to the lives of others, but by 2004, he might have forgotten it.
>
> In short, the trial court properly found that [Petitioner's] DUI convictions, the curriculum of his later DUI program, and his lengthy participation in that program were relevant to show his knowledge. Moreover, because that evidence did not reveal any inflammatory facts about the prior convictions, the trial court properly found that the evidence was more probative than prejudicial.  This is especially so because the court announced its intention to give, and later did give, an instruction advising jurors that the evidence could only be considered in determining [Petitioner's] knowledge that drunk driving was dangerous and warned them not to consider it as evidence of [Petitioner's] bad character or disposition to drive unlawfully.

Doc. #32 at 6–10.

With respect to the admission of evidence regarding Petitioner's three prior convictions for driving with a suspended license and the administrative decision to suspend his license as a negligent operator for some minor moving violation, the state appellate court found that the admission of the evidence was erroneous, but nonetheless harmless, stating as follows:

> [W]e agree with [Petitioner] that his convictions for driving with a suspended license and the administrative suspension had no tendency to show [Petitioner's] knowledge [about the dangerousness of drunk driving on the day of the incident].  The court admitted them because they were connected to his prior DUI convictions.  However, such a connection does not

United States District Court

For the Northern District of California

reasonably imbue the latter convictions with relevant and probative value concerning [Petitioner's] knowledge about the dangerousness of drunk driving at the time of the accident.  At most, it shows knowledge that driving with a suspended license is unlawful.  In our view, those convictions and the administrative suspension were no more relevant than the two similar suspended-license convictions and speeding convictions that the court excluded.

The question now is whether the admission of these convictions was prejudicial.  We think not.  First, driving with a suspended license, without more, is a fairly innocuous offense, and the evidence did not reveal details about those offenses that might have inflamed the jury or otherwise caused an emotional bias against [Petitioner].  Although the administrative suspension deemed [Petitioner] a "negligent operator," the evidence did not reveal the factual basis for that characterization.  Moreover, that label could not have caused any more bias against [Petitioner] than the evidence of his drunken and extremely reckless driving the night of the accident.

Second, any possibility that jurors might hold these additional convictions against [Petitioner] was negated by the court's limiting instruction concerning the permissible and impermissible uses of the evidence.  In the absence of evidence to the contrary – and there is no such evidence – we presume that the jury understood and followed this instruction.  (People v. Panah (2005) 35 Cal.4th 395, 492; People v. Stanley (1995) 10 Cal.4th 764, 837.)  Indeed, [Petitioner] concedes that the jurors probably followed the court's instruction.  For this reason, the prosecutor's reference to those additional convictions during argument to the jury could not have been prejudicial.

Next, there was overwhelming evidence of implied malice murder.  After Watson, supra, 30 Cal.3d 290, numerous courts have upheld drunk-driving murder convictions based on some or all of the following factors:  (1) blood-alcohol level above the .08 percent legal limit; (2) a pre-drinking intent to drive; (3) actual knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving. (People v. Autry, supra, 37 Cal.App.4th at p. 358; People v. Talamantes, supra, 11 Cal.App.4th at p. 973.)  For example, in People Olivas [sic] (1985) 174 Cal.App.3d 984, the court found evidence that the defendant consumed alcohol and PCP, drove at extremely high speed for a lengthy period of time, caused collisions and near collisions, and fled sufficient to show implied malice and support his murder conviction. (Id. at p. 989.)

Here, it is undisputed that [Petitioner] intended to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

drive home from work, and, having previously suffered two DUI convictions and completed DUI education programs, he nevertheless consumed alcohol and marijuana and then drove at high speeds for a significant period of time, swerved erratically from left to right across the freeway, nearly caused collisions, and drove off the freeway and onto an embankment and then back onto the freeway.  Together this evidence constituted compelling proof of implied malice.  Indeed, defense counsel conceded during final argument that [Petitioner] was guilty of gross vehicular manslaughter while intoxicated, which was also charged.  That offense requires a finding that [Petitioner] drove in a way that created a high degree of risk of death or great bodily injury and that a reasonable person would have known that that conduct created such a risk.  Thus, the only real issue at trial was whether [Petitioner] personally and subjectively knew what a reasonable person would have known under the circumstances and nevertheless disregarded that risk.

Finally, the jury had substantial bases to reject evidence suggesting that the accident may have caused by [Petitioner's] concern for his son and effort to rush home to help his wife.  In this regard, the defense offered no evidence to corroborate the timing of Rodriguez's calls to [Petitioner] or her statement that their son was having a seizure that day.  She told an investigator that after the accident, [Petitioner] sounded normal, sober, and so calm that she thought he was joking.  She did not say that [Petitioner] asked about their son but only that he asked for a ride. [Petitioner]  also did not tell the CHP that he was rushing home to help his wife deal with their son.  He simply said he had fallen asleep at the wheel. Moreover, in accordance with the court's instruction, the jury could have found that being [Petitioner's] wife, Rodriguez was biased in his favor.  (See CALCRIM No. 226.)

The jury could have considered [Petitioner's] friends biased in his favor.  Moreover, any benefit from their opinion that he was a cautions [sic] and careful person was undermined by the undisputed how he drove on the night of the accident.

Under the circumstances, we do not find it reasonably probable that the jury would have reached a more favorable verdict on the second degree murder charges had the court excluded the evidence of [Petitioner's] convictions for driving with a suspended

United States District Court

For the Northern District of California

1

2

license and his administrative suspension.[3]  (People v. Watson (1956) 46 Cal.2d 818, 836.)

3       Doc. #32 at 10–12, footnote in original, renumbered.

4           Imposing AEDPA's "highly deferential standard for evaluating state-court

5   rulings" and giving the state appellate court's decision "the benefit of the doubt," as

6   this Court must, see Felkner, 131 S. Ct. at 1307 (citation omitted), this Court cannot

7   say that the state appellate court's rejection of Petitioner's due process claim was

8   objectively unreasonable under AEDPA, as explained below.

9           The admission of Petitioner's two DUI convictions and participation in DUI

10   counseling programs did not violate due process because the jury could draw

11   permissible inferences from these pieces of evidence.  The jury could infer from this

12   evidence that he acted with implied malice, a finding that is required for the killings

13   to be second degree murder.  Implied malice is present when a defendant knows that

14   his conduct endangers the life of another, and deliberately engages in such conduct.

15   People v. Waston, 30 Cal.3d 290, 296–97 (1981).  Under state law, a prior drunk

16   driving conviction was relevant to prove Petitioner's subjective knowledge and

17   awareness of the risks of drunk driving.  See Doc. #32 at 6–7, 8.  Similarly,

18   participation in an alcohol education program after conviction was also relevant to

19   prove Petitioner's knowledge of the risks of drunk driving.  Id. at 9–10.  The

20   evidence of the prior convictions and participation in DUI counseling programs were

21   properly admitted under state law and the jury could draw the permissible inference

22   from the evidence that Petitioner acted with the malice necessary for second degree

23   murder when he killed the victims.  There was no federal constitutional error in the

24   admission of the evidence.

25

26
         [3]  Given our analysis, we reject [Petitioner's] claim that the erroneous
27   admission of his driving record rendered his trial fundamentally unfair and thus
     compels review and reversal under the more stringent federal standard of review in
28   Chapman v. California (1967) 386 U.S. 18, 24.

1       Even if there had been no permissible inference that could be drawn from the
2   evidence, any error resulting from its admission would have been harmless.  There
3   was ample testimony indicating that Petitioner knew his conduct endangered the
4   lives of others and deliberately engaged in such conduct.  Blood tests revealed that
5   Petitioner had a blood-alcohol level of .13 percent three hours after the car accident
6   and that he had used marijuana around the time of the accident.  Various witnesses
7   testified to seeing Petitioner driving over 80 m.p.h., swerving between lanes, forcing
8   other cars to the shoulder, exiting the freeway and then driving up an embankment,
9   backing down and re-entering the freeway.  While a prior conviction might in some
10  cases improperly tilt the evidentiary balance, it did not do so here.  See Brecht, 507
11  U.S. at 623, 637 (to obtain habeas relief on the basis of an evidentiary error, a
12  petitioner must show that the error had "a substantial and injurious effect" on the
13  verdict).  The state appellate court's rejection of Petitioner's claims with respect to
14  the prior DUI convictions and participation in DUI counseling programs was not
15  based on an unreasonable determination of the facts in light of the evidence
16  presented at trial.

17      Similarly, it was not unreasonable for the state appellate court to reject
18  Petitioner's due process claim regarding the erroneous admission of Petitioner's
19  three prior convictions for driving with a suspended license and the administrative
20  decision to suspend his license as a negligent operator for some minor moving
21  violation.  The erroneously admitted evidence did not prevent a fair trial.  The state
22  appellate court carefully considered all the evidence presented to the jurors and the
23  nature of the erroneously admitted evidence and reasonably determined that the
24  admission of the convictions for driving with suspected license and the
25  administrative suspension as a negligent operator was not prejudicial.  As the state
26  appellate court noted, these prior convictions and the administrative decision were
27  fairly innocuous offenses that could not have caused any more bias against
28  Petitioner than the evidence of his drunken and extremely reckless driving the night

United States District Court
For the Northern District of California

1    of the accident, and the fact that his behavior caused the death of a child and her

2    grandmother.  See, e.g., Mancebo v. Adams, 435 F.3d 977, 979 (9th Cir. 2006)

3    (finding that the polygraph evidence played only a minor role at trial and, therefore,

4    the erroneous introduction of evidence that petitioner refused a polygraph was not

5    prejudicial in light of sufficient evidence supporting petitioner's conviction).

6    Moreover, any possibility of prejudice was negated by the trial court's limiting

7    instruction.  See Aguilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997) (juries are

8    presumed to follow a court's limiting instructions with respect to the purposes for

9    which evidence is admitted).  Finally, the erroneous admission of these pieces of

10   evidence did not have a "substantial and injurious effect" on the verdict.  See Brecht,

11   507 U.S. at 623, 637.  The state appellate court's rejection of Petitioner's claims

12   with respect to the prior DUI convictions and participation in DUI counseling

13   programs was not based on an unreasonable determination of the facts in light of the

14   evidence presented at trial.  Accordingly, the Court must deny Petitioner habeas

15   relief on his due process claim regarding admission of his driving record.

16       2.    Erroneous Jury Instruction

17   Petitioner claims that the trial court erroneously instructed the jury on

18   assumption of risk and voluntary intoxication, and thereby misinstructed on the

19   defense of voluntary intoxication and the knowledge element of hit-and-run driving.

20   He also alleges that the trial court erroneously instructed the jury on the required

21   concurrence of act and mental state.

22       The state appellate court agreed with Petitioner that the trial court erred in

23   giving the jury instruction on assumption of risk and voluntary intoxication but

24   found that there was no prejudice to Petitioner:

25           [Petitioner] contends that the court erred in giving
             the following specially crafted instruction:  "Voluntary
26           intoxication is not a defense to any of the crimes charged
             in this case.  When a person voluntarily causes his own
27           intoxication, the person assumes the risk that while
             intoxicated his judgment, his ability to perceive risk and
28           exercise caution, his ability to process and act upon

United States District Court
For the Northern District of California

information, and his physical abilities may be diminished."

"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case."  (People v. St. Martin (1970) 1 Cal.3d 524, 531, italics added; accord, People v. Breverman (1998) 19 Cal.4th 142, 154; People v. Watie (2002) 100 Cal.App.4th 866, 881.)  Conversely, the court "has the correlative duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' [Citation.]"  (People v. Saddler (1979) 24 Cal.3d 671, 681, quoting People v.. Satchell (1981) 6 Cal.3d 28, 33, fn. 10; People v. Barker (2001) 91 Cal.App.4th 1166, 1172, overruled in People v. Flood (1998) 18 Cal.4th 470.)  Thus, "[i]t is error for a court to give an 'abstract' instruction, i.e., 'one which is correct in law but irrelevant [.]' [Citation.]"  (People v. Rowland (1992) 4 Cal.4th 238, 282.)

**Implied Malice Murder**

[Petitioner] claims the instruction is legally incorrect insofar as it imports a concept of assumption of the risk that finds no support in California law. He notes that in California, "[a] person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect." (CALCRIM Nos. 625, second italics added; CALCRIM No. 3426; see former CALJIC No. 4.22 [same content, slightly different wording]; People v. Wyatt (1972) 22 Cal.App.3d 671, 677.) According to [Petitioner], this definition uses the concept of assumption of risk only as a means of determining whether a defendant was voluntarily intoxicated; and in that context, the only risk being assumed is that of becoming intoxicated. [Petitioner] points out that the court's instruction has nothing to do with the threshold issue of whether a defendant is voluntarily intoxicated and goes beyond the general risk of intoxication to enumerate specific types of risks that a voluntarily intoxicated person assumes. [Petitioner] argues that there is no legal authority supporting either the content of the instruction or giving it.

It is not clear why the court felt it was necessary to craft this special instruction.  We note that [Petitioner]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

was charged with both second degree, implied malice murder and vehicular manslaughter with gross negligence while intoxicated. In connection with the latter, the court instructed jurors that "[i]n evaluating whether the [Petitioner] acted with gross negligence, consider the level of the [Petitioner's] intoxication, if any, the way the [Petitioner] drove, and any other relevant aspects of the [Petitioner's] conduct," indicating that the jury could consider the evidence of voluntary intoxication in determining gross negligence. We observe that the court crafted another instruction clarifying the difference between vehicular manslaughter with gross negligence while intoxicated and implied malice murder, explaining that to determine the former, the jury uses an objective test – i.e., would a reasonable person have been aware of the risk of danger to others – and to determine implied malice murder, the jury has to find that the [Petitioner] actually and subjectively appreciated the risk. This is the context in which the court gave the challenged instruction.

The first part of the instruction reflects section 22, which provides, "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition." (§22, subd. (a).) Accordingly, the court correctly instructed the jury that voluntary intoxication was not a *defense* to any of the crimes charged. (See generally, 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, §§ 1–54 [describing defenses to crimes].) [Petitioner] concedes that "[v]oluntary intoxication is not per se a defense to any crime [citations], so the instruction's first sentence was unobjectionable ."

Section 22 further provides that "[e]vidence of voluntary intoxication is admissible solely on the issue of whether or not the [Petitioner] actually formed a required specific intent, or, when charged with murder, whether the [Petitioner] premeditated deliberated, or harbored express malice ...." (§ 22, subd. (b).) Because [Petitioner] was charged with implied malice second degree murder, evidence of voluntary intoxication was not admissible to *negate* implied malice, that is, to show that [Petitioner] did *not* act with knowledge of the danger to, and conscious disregard for, human life. (People v. Williams (2001) 26 Cal.4th 779, 789; People v. Conley (1966) 64 Cal.2d 310, 323–24; People v. Timms (2007) 151 Cal.App.4th 1292, 1302.) For this reason, the standard instructions on voluntary intoxication were inapplicable. (CALCRIM Nos. 3426

United States District Court

For the Northern District of California

& 625.)[4]  Indeed, they might even suggest that evidence of voluntary intoxication could not be considered to show that [Petitioner] *acted* with implied malice.

If the court's goal was to provide guidance concerning the permissible and impermissible uses of evidence of voluntary intoxication in connection with the implied malice murder charge, it failed because its special instruction provides no such guidance. Moreover, we agree with [Petitioner] that the instruction does not reflect any principle of law, let alone one that is closely and openly connected with the facts of the case and necessary to the jury's understanding.

In support of the special instruction, the Attorney General reasons that if a person can willingly assume the general risk of becoming intoxicated and that general risk necessarily includes the specific risk of diminished abilities, perception, and judgment, then a person can also willingly assume those specific risks. Such an assumption is reasonable, the Attorney General argues, because we may presume that people know the hazards of drunk driving.

Although what the Attorney General says may be true, it does not provide legal support for the instruction. Nor does the Attorney General explain the relevance of the instruction or the purpose it may have served. Thus, we conclude that the court erred in giving it and turn to whether it was prejudicial.

[Petitioner] argues that the instruction unfairly and impermissibly drew attention to the evidence of [Petitioner's] voluntary intoxication and provided the conclusion they were supposed to draw from it: [Petitioner] was legally responsible for his diminished faculties. [Petitioner] further argues that this message

---

[4]CALCRIM No. 3426 states, in relevant part, "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with [the specific intent to do the act required.] [] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect." (Italics added.)
    CALCRIM No. 625 provides, in relevant part, "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill. [] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink or other substance, knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [] You may not consider evidence of voluntary intoxication for any other purpose." (Italics added.)

tended to "devalue[ ]" other evidence that suggested that his careless driving and diminished faculties and judgment were caused by his concern for his wife and son, his overtiredness, and/or his belief that someone was after him on the freeway.  Thus, [Petitioner] claims that the instruction "effectively directed – or at least permitted – jurors to ignore those valid factors" that otherwise might have raised doubt concerning whether he acted with implied malice.  We disagree.

First, the content of the instruction is unquestionably true.  When a person knowingly and voluntarily becomes intoxicated, he or she necessarily accepts the risks associated with being in that state, which include diminished or impaired motor skills, reaction time, sensory perceptions, and judgment.  Thus, the instruction simply reflects common knowledge about the effects of intoxication.

Next, we note that the instruction applies only if, and when, the jury has found that the [Petitioner] was voluntary intoxicated.  However, concerning that determination, the instruction does not identify any particular evidence, suggest that [Petitioner] was voluntarily intoxicated, or imply the jury should find that he was.  On the contrary, the court expressly warned jurors "not [to] take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdicts should be." (CALCRIM No. 3550.)

Next, the instruction provides that a voluntarily intoxicated person assumes the risk that "while intoxicated," his or her abilities, perceptions, and judgment "may" be diminished.  Thus, the instruction is limited: a voluntarily intoxicated person assumes the risk of diminished capacities *caused by his or her state of intoxication*.  It does not suggest that a person assumes the risk of diminished capacities caused by other factors, circumstances, or conditions unrelated to intoxication; nor does the instruction direct, encourage, or permit jurors to disregard such factors, circumstances, and conditions or even suggest that they may do so in determining implied malice.  The prosecutor certainly did not argue that the instructions should be applied in that way, and we find no reasonable likelihood that the jurors understood the instruction in that way. (Estelle v. McGuire (1991) 502 U.S. 62, 72 [instructions erroneous where court finds reasonable likelihood that jurors would misunderstand them].)  Indeed, the court instructed the jurors to "compare and consider *all of the evidence* that was received throughout the entire trial." (CALCRIM No. 220, italics added.)

Concerning the other factors that the jury might

have disregarded or at least undervalued, we note that any inference the jury might have drawn from Rodriguez's testimony about their son's seizure that day was, as discussed above, undermined by her potential bias, the lack of corroboration about the seizure, and, most tellingly, [Petitioner's] failure to tell the CHP that he was rushing home to care for his son or even to express concern about him.  Any inference from Rodriguez's testimony about [Petitioner] not having slept the night before and from [Petitioner's] statement he had fallen asleep were undermined by her bias and [Petitioner's] testimony that he had had a full night's sleep.  And any inference from Rocha's testimony that [Petitioner] feared he was being followed undermined by the fact that [Petitioner] had been driving recklessly long before his encounter with Rocha, the lack of evidence [Petitioner] knew Rocha was following him, and [Petitioner's] failure to tell police that he thought he was being chased.

Finally, we note that during closing argument, defense counsel did not suggest that any of these factors diminished or affected [Petitioner's] driving abilities, explained why he was driving so recklessly, or contributed to the accident.  On the other hand, there was overwhelming evidence that [Petitioner's] reckless driving was due to his being under the influence of alcohol and marijuana.

Under the circumstances, we do not find it reasonably probable the jury would have reached a more favorable verdict on the implied malice murder charges had the challenged instruction not been given.[5]  (People v. Watson, supra, 46 Cal.2d at p. 836.)

**Hit-and-Run Driving**

[Petitioner] also claims the instruction was prejudicial concerning the charge of hit-and-run driving and the similar enhancement allegations.  (Veh. Code, § 20001, subds.(b)(2) & (c).)  This claim is based on the entire special instruction and focuses on the first statement that voluntary intoxication is not a defense to any of the charged offenses. [Petitioner] concedes that this is legally correct but argues that the instruction was inadequate because it failed to explain that voluntary intoxication, though not a defense, could be considered in determining whether [Petitioner] had the requisite mental state for hit-and-run driving – i.e., actual

---

[5]Because we do not find that the instruction had a tendency to direct or permit jurors to disregard evidence that [Petitioner] might not have acted with implied malice or otherwise eliminated a relevant consideration in that regard, we reject [Petitioner's] claim that the instruction violated [Petitioner's] right to due process.

United States District Court

For the Northern District of California

knowledge that the accident had caused injury to another person.[6]

[Petitioner] acknowledges that section 22 permits evidence of intoxication only to negate *specific intent*, and hit-and-run driving is considered a general intent offense. (People v. Sheer (1998) 68 Cal.App.4th 1009, 1019.) However, citing People v. Mendoza (1998) 18 Cal.4th 1114 (Mendoza) and People v. Reyes (1977) 52 Cal.App.4th 975 (Reyes), [Petitioner] argues that, as used in section 22, specific intent broadly encompasses the knowledge element of general intent crimes, including hit-and-run driving.[7] We disagree and find [Petitioner's] reliance on Mendoza and Reyes to be misplaced.

In Mendoza, supra, 18 Cal.4th 1114, the issue was whether voluntary intoxication was admissible to negate the mental state required to establish liability as an aider and abettor. Before addressing it, the court opined that "[t]he division of crimes into two categories, one requiring 'general intent' and one 'specific intent,' is both simplistic (some crimes have other required mental states such as knowledge) and potentially confusing." (Id. at pp. 1126-1127.) Citing People v. Hood (1969) 1 Cal.3d 444, at pages 456-457 (Hood), the court explained that "'[w]hen the definition of a crime consists of only the description of a particular act, without reference to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.' [Citation.]" (Mendoza, supra, 18 Cal.4th at p. 1127.) However, the court noted that under some circumstances, even this definition was an

_____

[6]Hit-and-run driving-whether charged as a crime or an enhancement-requires proof that (1) the driver was involved in an accident resulting another person's serious injury or death; (2) *the driver knew that he or she had been involved in an accident and either knew that someone was injured or should have known from the nature of the accident that such injury was probable;* and (3) the driver willfully failed to stop, provide reasonable assistance, and/or notify the police or CHP without unnecessary delay. (CALCRIM No. 2140; People v. Hamilton (1978) 80 Cal.App.3d 124, 132, overruled on another ground in People v. Flood, supra, 18 Cal.4th at pp. 481, 484; CALCRIM Nos. 2140 [crime], 2160 [enhancement].)

[7][Petitioner] also cites People v. Whitfield (1994) 7 Cal.4th 437, in which the court held that evidence of involuntary intoxication was admissible to negate implied malice. (Id. at p. 451.) However, that holding was abrogated by a subsequent amendment of section 22, which, as noted, now permits such evidence to negate express, but not implied, malice. (Mendoza, supra, 18 Cal.4th at p. 1125; People v. Timms, supra, 151 Cal.App.4th at pp. 1297-1298.)

United States District Court

For the Northern District of California

1   inadequate test, and the applicable scope of section 22
2   rested also on "policy considerations" concerning
    whether it is reasonable and appropriate to allow
    evidence of intoxication to relieve a person of criminal
3   responsibility. (Id. at pp. 1127-1128.)

4       As an example, the court noted that in Hood,
    supra, 1 Cal.3d 444, the question was whether voluntary
5   intoxication should be admissible to negate the mental
    element of assault.  The Mendoza court pointed out that
6   in concluding that it was not, the Hood court relied
    primarily on policy considerations and not the
7   categorization of assault as a general intent crime.
    (Mendoza, supra, 18 Cal.4th at p. 1128.)  In particular,
8   the Hood court reasoned, "[A] drunk man is capable of
    forming an intent to do something simple, such as strike
9   another, unless he is so drunk that he has reached the
    stage of unconsciousness.  What he is not as capable as a
10  sober man of doing is exercising judgment about the
    social consequences of his acts or controlling his
11  impulses toward anti-social acts.  He is more likely to act
    rashly and impulsively and to be susceptible to passion
12  and anger.  It would therefore be anomalous to allow
    evidence of intoxication to relieve a man of
13  responsibility for the crimes of assault with a deadly
    weapon or simple assault, which are so frequently
14  committed in just such a manner."  (Hood, supra, 1
    Cal.3d at p. 458.)

15
16      The Mendoza court noted that to be liable for
    aiding and abetting a crime, a person must *know* about
17  the direct perpetrator's criminal purpose and *intend* to
    facilitate it.  The court opined that this mental state
18  easily fit within the Hood court's definition of specific
    intent. (Mendoza, supra, 18 Cal.4th at p. 1129.)
19  Moreover, the court discerned no policy reasons against
    the use of voluntary intoxication to negate that
20  knowledge and intent.  The court explained, "*Awareness*
    of the direct perpetrator's purpose is critical for the
21  alleged aider and abettor to be culpable for that
    perpetrator's act.  A person may lack such awareness for
22  many reasons, including intoxication.  A person who is
    actually unaware that his or her noncriminal act might
23  help another person commit a crime should not be
    deemed guilty of that crime and all of its reasonably
24  foreseeable consequences even if intoxication
    contributes to, or is the sole reason for, that lack of
25  awareness."  (Ibid., italics in Mendoza.)

26      The court explained that in Hood, in contrast, "we
    were concerned that a 'drunk' person should not be
27  relieved of responsibility for criminal acts that are
    frequently committed because the person is drunk.
28  Justice Mosk expressed a similar concern in [People v.
    Whitfield, supra, 7 Cal.4th at p. 463 (conc. and dis. opn.

of Mosk, J.) ]: '[A]lcohol intoxication naturally lends itself to the crime's commission because it impairs the sound judgment or lowers the inhibitions that might stop a sober individual from committing a highly dangerous act leading to another's death.' [Citation.]  This concern does not have the same force regarding an alleged aider and abettor as it has regarding the person who actually commits the dangerous act.  Anyone, including a drunk person, who knowingly and intentionally aids and abets a criminal act is guilty.  Intoxication is relevant only to show the person did not act knowingly and intentionally.  A drunk person does not *unknowingly* and *unintentionally* help others commit crimes significantly more often than other persons." (<u>Mendoza</u>, <u>supra</u>, 18 Cal.4th at p. 1130, italics in <u>Mendoza</u>.)

In <u>Reyes</u>, <u>supra</u>, 52 Cal.App.4th 976, which was decided before <u>Mendoza</u>, the issue was whether voluntary intoxication was admissible in a prosecution for receiving stolen property to negate knowledge that the property was stolen.  (<u>People v. Grant</u> (2003) 113 Cal.App.4th 579, 596 [knowledge is an element].)  Relying on <u>Hood</u>, <u>supra</u>, 1 Cal.3d 444 and <u>People v. Whitfield</u>, <u>supra</u>, 7 Cal.3d 437, the court held that "with regard to the element of knowledge, receiving stolen property is a 'specific intent crime,' as that term is used in section 22, subdivision (b)...." (<u>Reyes</u>, <u>supra</u>, 52 Cal.App.4th at p. 985.)  Thus, voluntary intoxication was admissible to negate it. (<u>Ibid.</u>)

Turning to this case, we note that unlike the mental element for aiding and abetting, the knowledge element of hit-and-run driving does *not* fit within <u>Hood</u>'s definition of specific intent, in that the definition of that offense does not refer to the "defendant's intent to do some further act or achieve some additional consequence ...." (<u>Hood</u>, <u>supra</u>, 1 Cal.3d at pp. 456–457; <u>People v. Davis</u> (1995) 10 Cal.4th 463, 518, fn. 15.)  Moreover, the policy consideration discussed in <u>Hood</u> applies with equal force here and militates against the use of voluntary intoxication to negate knowledge that an accident caused injury.  Like assault, hit-and-run driving frequently is committed by those who have caused an accident while driving under the influence.  Thus, in our view, it would be just as "anomalous" to allow voluntary intoxication to relieve a drunk driver of responsibility for fleeing the scene as it is to allow voluntary intoxication to relieve a defendant of responsibility for an assault.

We acknowledge that the knowledge element of receiving stolen property discussed in <u>Reyes</u> also does not fit within <u>Hood</u>'s definition of specific intent.  However, the holding in <u>Reyes</u> is nevertheless understandable because, unlike assault or hit-and-run driving, receiving stolen property is not ordinarily the

United States District Court

For the Northern District of California

type of crime that is frequently committed by those who are under the influence.  Thus, policy considerations do not militate against the use of voluntary intoxication to negate knowledge that property is stolen.

Mendoza and Reyes are inapplicable for yet another reason.  In both cases, the offenses required actual knowledge – in Mendoza, knowledge of the perpetrator's criminal design; in Reyes, knowledge of the nature of the property.  However, in People v. Holford (1965) 63 Cal.2d 74, the California Supreme Court observed, "[T]he driver who leaves the scene of the accident seldom possesses actual knowledge of injury; by leaving the scene he forecloses any opportunity to acquire such actual knowledge.  Hence a requirement of actual knowledge of injury would realistically render the statute useless.  We therefore believe that criminal liability attaches to a driver who knowingly leaves the scene of an accident if he actually knew of the injury *or if he knew that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person.*"  (Id. at p. 80, fn. omitted, italics added.)  In other words, a conviction for hit-and-run driving does not require actual or subjective knowledge that another person has been injured.  Rather, "[s]uch knowledge ... may be imputed to the driver of a vehicle where the fact of personal injury is visible or obvious, *or where the seriousness of the collision would lead a reasonable person to assume that there must have been resulting injury.*" (People v. Ryan (1981) 116 Cal.App.3d 168, 180, italics added.)

Since jurors, in determining whether the [Petitioner] had the requisite knowledge that an accident caused injuries, may apply an objective standard based on what a reasonable person would assume from the seriousness of the accident, it does not matter whether, as a result of impairment due to voluntary intoxication, a defendant was subjectively unaware that his or her accident caused injuries.[8]  Indeed, where the evidence supports a finding that a reasonable person would have known that the accident probably caused injuries, a defendant may be convicted of hit-and-run driving even if the evidence established that he was subjectively unaware of that fact.

In sum, Mendoza and Reyes do not support [Petitioner's] claim that the court erred in failing to

---

[8][Petitioner] did not argue below and does not now suggest that at the time he fled, he was unaware that he was in a serious accident; nor could he reasonably do so, given the nature of his driving, the condition and position of his vehicle after the accident, and the evidence that he looked around immediately after the accident and then ran.

1
2
instruct the jury that voluntary intoxication could be considered in determining whether [Petitioner] knew his accident had injured another person.

3
4
Moreover, even if we assume that the court should have given such an instruction, we would not find that its failure to do so was prejudicial.

5
6
7
8
9
[Petitioner] argues that the omission was prejudicial because (1) his "subjective knowledge" that a person had been injured was a key issue; (2) the evidence that he had actual knowledge was entirely circumstantial; and (3) given the evidence of diminished perception and reaction time due to voluntary intoxication, jurors might have found that after the accident, [Petitioner] was in shock and did not fully comprehend the extent of the collision and its effects until after he fled from the scene.  We disagree.

10
11
12
13
14
15
16
17
18
First, there was strong circumstantial evidence that [Petitioner] knew the accident had caused injuries. It is undisputed that [Petitioner] swerved and directly collided with the victim's vehicle, causing it to skid and roll over and [Petitioner] to lose control and roll over. Three passengers were ejected.  Nick Rocha, who stopped near the scene, testified, "I went to see if I could see anybody moving or anything. I walked across, and that's when I seen [Petitioner's vehicle] turned over on-with the wheels up.  But before I got to that, I saw the little girl-or one of the passengers that had been on-in the van, a small child, and she was in a puddle of blood." He then went over to [Petitioner's] vehicle.  It was empty, but he saw the shadow of someone leaving the scene.  Acuna testified that after the accident, she saw [Petitioner] get out of his SUV.  He then "glanced at everything" and started to run.

19
20
21
22
Next, regardless of whether [Petitioner] actually knew the accident had caused injury, there was overwhelming evidence that a reasonable person in [Petitioner's] position certainly would have known not only that the accident had been serious but also that it probably resulted in injuries to those in the other vehicle, especially after a survey of the aftermath.

23
24
25
Last, defense counsel did not suggest that [Petitioner] was unaware that the accident caused injuries and, therefore, should not be convicted of hit-and-run driving.  Indeed, counsel offered no specific defense to the charge or enhancement allegations.

26
27
28
Under the circumstances, we do not find it reasonable [sic] probable that [Petitioner] would have obtained a more favorable verdict or finding had the jury been allowed to consider voluntary intoxication in

1   determining the charges and enhancements related to
    hit-and-run driving. (People v. Watson, supra, 46 Cal.2d
2   at p. 836.)

3   Doc. #32 at 14–26, footnotes in original, renumbered; emphasis in original.

4       The state appellate court also rejected Petitioner's argument that the trial

5   court's instruction of the union of criminal act and intent was defective in that in

6   "eliminated the knowledge element of the offense and enhancement."  Id. at 31.  The

7   state appellate court further noted that even if the instruction were defective, any

8   error was harmless:

9

10              **The Instruction on the Union of Act and Intent**

11              [Petitioner] contends that the court's instruction
            on the union of criminal act and intent was defective.

12              The court instructed the jury, "Every crime or
            allegation charge in this case requires proof of the union
13          or joint operation of the act and wrongful intent.  All of
            the crimes, except Counts One and Two, which are the
14          second degree murder charges, require general criminal
            intent.  *[T]o be guilty of these offenses – and I'm*
15          *referring to every crime other than second degree*
            *murder – a person must not only commit the prohibited*
16          *act, or fail to do the required act, but must do so*
            *intentionally or on purpose.*  It is not required, however,
17          that the person intend to break the law.  The act required
            is explained in the instruction for each crime or
18          allegation.  [] The following crimes – and I'm referring
            here to Counts One and Two, the second degree murder
19          charges-require a specific mental state.  To be guilty of
            these offenses, a person must not only intentionally
20          commit the prohibited act or intentionally fail to do the
            required act, but must do so with a specific mental state.
21          The act and the mental state required are explained in the
            instructions for each crime or allegation."  (Italics added;
22          see CALCRIM No. 252.)

23              [Petitioner] notes that the charge and
            enhancement allegations required more than the general
24          intent to commit an act or omission; they required
            *knowledge* that the [Petitioner] had been involved in an
25          accident causing injury.  [Petitioner] points out that the
            CALCRIM Bench Note for the instructions on general
26          and specific intent and the required concurrence of act
            and intent advises that "[i]f a crime requires a specific
27          mental state, such as knowledge or malice, the court
            must insert the name of the [offense or enhancement]
28          requiring that mental state], even if the crime is

United States District Court
For the Northern District of California

classified as a general intent offense." (CALCRIM No. 252 (2008), Bench Notes, p. 69 [check citation form].) [Petitioner] argues that in referring to the hit-and-run driving as a general intent crime, the court indicated that the prosecutor only had to prove the intent to flee and not also knowledge of the accident.  Thus, he claims that, in effect, the court eliminated the knowledge element of the offense and enhancements.

In analyzing a claim of inadequate instructions, we do not focus on a single instruction but instead review the entire charge to the jury in light of the evidence and the arguments of counsel to determine whether there is a "'reasonable likelihood'" that the jury understood the instructions in the manner proposed by the [Petitioner].  (Estelle v. McGuire, supra, 502 U.S. at p. 72; Boyde v. California (1990) 494 U.S. 370, 378-381; People v. Holt (1997) 15 Cal.4th 619, 677; People v. Clair (1992) 2 Cal.4th 629, 663; People v. Dieguez (2001) 89 Cal.App.4th 266, 276.)

We agree with [Petitioner] that the court should have followed the direction of the Bench Note and told jurors that the prosecutor had to prove both intent to flee and knowledge about the accident.  (See People v. Alvarez (1996) 14 Cal.4th 155, 220 [duty to give proper instruction on concurrence of act and intent].)  However, the instruction, as given, did not state that the prosecutor had to prove *only* intent.  Moreover, the instruction referred jurors to the specific instructions on the charge and enhancements, and those instructions expressly informed the jury that the prosecution had to prove knowledge.  (CALCRIM Nos. 2140, 2160.)  The jurors were also told to consider the instructions together.

Thus, we find no reasonable likelihood that the jury would consider the concurrence instruction in isolation and misunderstand it to eliminate the knowledge element. Rather, we find it likely that, in accordance with the court's instructions, the jury understood that the prosecution had to prove knowledge beyond a reasonable doubt.

[Petitioner] also argues that because the instruction did not refer to the knowledge element, it erroneously eliminated the requirement of concurrence between the prohibited act *and knowledge about the accident*.

Even if we assume for purposes of argument that the court's instruction was flawed in that respect, the absence of an essential element in one instruction may be cured by other instructions, where those instructions require jurors to resolve the factual question that would have been posed, jurors have the facts and means

1
2
3
4
5

necessary to make that determination beyond a reasonable doubt, and the instructional omission does not prevent them from doing so.  (People v. Castillo (1997) 16 Cal.4th 1009, 1016; People v. Cummings (1993) 4 Cal.4th 1233, 1313; People v. Garrison (1989) 47 Cal.3d 746, 789-790; People v. Burgener (1986) 41 Cal.3d 505, 539, disapproved on another point in People v. Reyes (1998) 19 Cal.4th 743, 753.)

6
7
8
9
10
11
12

Such is the case here.  The court's instruction on hit-and-run driving stated, in relevant part, "To prove that the defendant is guilty of this crime, the People must prove that, one, while driving[,] the defendant was involved in an accident; two, the accident caused the death of or permanent serious injury to someone else; three, the defendant knew that he had been involved in an accident that injured another person; or knew from the nature of the accident that it was probable that another person had been injured; *and four, that the defendant willfully failed to perform one or more of the following duties*: [stop, provide reasonable assistance, or notify authorities]."  (Italics added; see CALCRIM No. 2140.)

13
14
15
16
17
18
19
20
21
22
23
24
25
26

Clearly, the jury was required to find that [Petitioner] knew the accident had caused injury; and that after the accident, he fled with the intent do to so.  Although the instruction did not explicitly require a finding that the [Petitioner] fled knowing about the accident, we find that requirement obvious and inherent in the charge: what makes the failure to stop or perform required duties wrongful is that it is done with actual or constructive knowledge.  In our view, therefore, the instruction on the elements of the charge adequately conveyed, and the jury would have understood the requirement of concurrence of act, intent, *and knowledge*.  Thus, in convicting [Petitioner], the jury necessarily resolved that factual issue that a proper concurrence instruction would have posed.  Accordingly, we find the omission harmless under any standard of review. (People v. Flood, supra, 18 Cal.4th at p. 503, criticized on another ground by People v. McCall (2004) 32 Cal.4th 175, 187, fn. 14, citing the federal standard under Chapman v. California (1967) 386 U.S. 18, 24; People v. Bunyard (1988) 45 Cal.3d 1189, 1228, fn. 27, citing the state standard under People v. Watson, supra, 46 Cal.2d at p. 836.)  This is especially so given our discussion of the strong evidence showing [Petitioner's] actual and constructive knowledge about the accident before he fled the scene.

27

Doc. #32 at 30–33.

28

//

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     a.  <u>Standard</u>

   A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  <u>See</u> <u>Estelle</u>, 502 U.S. at 71–72.  <u>See</u>, <u>e.g.</u>, <u>Williams v. Calderon</u>, 52 F.3d 1465, 1480–81 (9th Cir. 1995) (jury instruction error based on state law error not cognizable on federal habeas). Nor does the fact that a jury instruction was inadequate by Ninth Circuit direct appeal standards mean that a petitioner who relies on such an inadequacy will be entitled to habeas corpus relief from a state court conviction.  <u>See</u> <u>Duckett v. Godinez</u>, 67 F.3d 734, 744 (9th Cir. 1995) (citing <u>Estelle</u>, 502 U.S. at 71–72). "'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'" <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).

   A claim of instructional error requires federal habeas relief only where the error "'by itself so infected the entire trial that the resulting conviction violates due process.'"  <u>Estelle</u>, 502 U.S. at 72 (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973); <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977); <u>Turner v. Calderon</u>, 281 F.3d 851, 865–66 (9th Cir. 2002).  An instructional error will violate due process only when there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution, <u>see</u> <u>Estelle</u>, 502 U.S. at 72, and where the erroneous instructions had a substantial and injurious effect on the verdict, <u>see</u> <u>Brecht</u>, 507 U.S. at 637–38.  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  <u>See</u> <u>Estelle</u>, 502 U.S. at 72; <u>see also</u> <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982) (citing <u>Henderson</u>, 431 U.S. at 154).

   However, even if the federal court finds that there was instructional error, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Brecht</u>, 507 U.S. at 637 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776

1   (1946).  The petitioner must demonstrate that the error resulted in "actual prejudice."

2   Id. (citation omitted).

3           b.    Analysis

4           The state appellate court reasonably concluded that although the trial court

5   erred in giving the specially crafted instruction regarding voluntary intoxication, the

6   instruction was not prejudicial.  Without prejudice, there is no due process violation.

7   See Estelle, 502 U.S. at 71–72.  The crux of Petitioner's argument is that the special

8   instruction imports a concept of assumption of risk that finds no support in

9   California law, specifically because it goes beyond the general risk of intoxication to

10  enumerate specific types of risks that a voluntarily intoxicated person assumes.

11  Petitioner argues that this special instruction prejudiced him in various ways:  1) this

12  special instruction caused the jury to disregard or undervalue reasons other than

13  intoxication that might have caused Petitioner to drive recklessly (e.g. concern for

14  his son, lack of sleep, fear of being followed); 2) this special instruction failed to

15  explain that voluntary intoxication could be considered in determining whether

16  Petitioner had the requisite mental state for hit-and-run-driving; 3) erroneously

17  omitted the knowledge element; and 4) erroneously omitted the concurrence element

18  as to knowledge.  Petitioner argues that the instruction on the union of criminal act

19  and intent prejudiced him by eliminating the requirement that the prosecution prove

20  knowledge of the accident.  To the extent Petitioner challenges either instruction as

21  an error under state law (e.g., in violation of People v. Mendoza, 18 Cal. 4th 1114

22  (1998) and People v. Reyes, 52 Cal. App. 4th 975 (1977)), see Doc. #32 at 20,

23  Petitioner does not state a claim cognizable in federal habeas proceedings.  See

24  Estelle, 502 U.S. at 71–72.  The question is whether there is a reasonable likelihood

25  the challenged instruction, viewed in the context of the instructions as a whole and

26  the trial record, had a substantial and injurious effect on the verdict.  See Estelle, 502

27  U.S. at 72; Brecht, 507 U.S. at 637–78.

28          Considering the special instructions in the context of the instructions as a

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    whole and in the context of the trial record, and affording the state appellate court

2    opinion the deference required by AEDPA, this Court finds that neither the special

3    instruction on voluntary intoxication nor the instruction on the union of act and

4    intent had a substantial or injurious effect on the verdict.  The state appellate court's

5    denial of the erroneous jury instruction claim was not objectively unreasonable

6    under AEDPA.

7            With regard to the special instruction, the record indicates that the other jury

8    instructions instructed the jurors to consider all the evidence presented at trial, see

9    Doc. #10 at 319; to not assume that the Court was suggesting anything about the

10   facts, id.; that they were required to find that Petitioner had willfully failed to remain

11   at the site, id. at 358, 361; and that they were required to find that Petitioner

12   committed the prohibited act or failed to do the required act "intentionally or on

13   purpose," id. at 328.  In addition, given the testimony at trial, it was reasonable to

14   conclude that the jurors would not have reached a more favorable verdict on the

15   implied malice murder charge or the hit-and-run-driving and similar enhancement

16   charges, had the special instruction not been given.  The testimony regarding other

17   reasons for Petitioner's erratic driving (lack of sleep, concern for his wife and child,

18   fear of being chased) was conflicting, and there was ample testimony regarding

19   Petitioner's reckless driving being caused by Petitioner's use of alcohol and

20   marijuana earlier that day.  The evidence presented also supported a finding that

21   Petitioner was aware that the collision had likely caused injury.

22           With regard to the instruction on the union of act and intent, the record

23   indicates the other jury instructions specified that the prosecution had to prove that

24   Petitioner knew of the accident.  CALCRIM 2160 instructed that in order to find

25   Petitioner guilty of vehicular manslaughter, the prosecution must prove that

26   Petitioner "knew that (he/she) had been involved in an accident that injured another

27   person or knew from the nature of the accident that it was probable that another

28   person had been injured . . ."  Doc. #10 at 358.  Similarly, CALCRIM 2140

United States District Court

For the Northern District of California

1   instructed that in order to find Petitioner guilty of failing to perform a legal duty

2   following a vehicle accident, the prosecution must prove that the Petitioner "knew

3   that he had been involved in an accident that injured another person or knew from

4   the nature of the accident that it was probable that another person had been injured."

5   Id. at 361.  Considering the instructions as a whole, there is no reasonable likelihood

6   that the jury failed to understand that the prosecution had to prove the knowledge

7   element of the hit and run and the special allegations.

8          Accordingly, the Court must deny Petitioner habeas relief on his claim of

9   erroneous jury instruction.

10         3.    Failure to Give Requested Jury Instruction

11         Petitioner also argues that the trial court erred in rejecting his proposed

12  instruction on implied malice.  The state appellate court rejected this claim as

13  follows:

14                      **Requested Instruction of Implied Malice**

15                 [Petitioner] contends that the court erred in
       rejecting his proposed instruction defining implied
16     malice.  [Petitioner] requested the following instruction:
       "Implied malice is shown if you find beyond a
17     reasonable doubt that the defendant, for a base,
       anti-social motive and with wanton disregard for human
18     life, committed an act that involves a high probability
       that it will result in death ...."  (Italics added.)  The court
19     declined it and instead gave the standard instruction,
       CALCRIM No. 520, which, as given, stated, "The
20     defendant acted with implied malice if, one, he
       intentionally committed an act; two, the natural and
21     probable consequences of the act were dangerous to
       human life; three, at the time he acted, he knew that his
22     act was dangerous to human life; and, four, he
       deliberately acted with conscious disregard for human
23     life."  (Italics added.)  We find no error.

24                 "'[I]mplied malice has both a physical and mental
       component'" – i.e., the doing of an act with a particular
25     mental state.  (People v. Taylor (2004) 32 Cal.4th 863,
       868; People v. Hansen (1994) 9 Cal.4th 300, 308.)
26     [Petitioner's] proposed instruction and the court's
       instruction reflect alternative judicial reformulations of
27     the statutory definition of implied malice, which courts
       consider to be cryptic, amorphous, unworkable, and

28

United States District Court

For the Northern District of California

1

potentially confusing.[9] (<u>People v. Nieto Benitez</u> (1992) 4 Cal.4th 91, 103 (<u>Nieto Benitez</u> ); <u>People v. Phillips</u> (1966) 64 Cal.2d 574, 587 (Phillips ), <u>overruled on other grounds in</u> <u>People v. Flood</u>, supra, 18 Cal.4th at p. 490, fn. 12; <u>People v. Protopappas</u> (1988) 201 Cal.App.3d 152, 162–163.)

[Petitioner's] instruction reflects the formulation of implied malice by Justice Traynor in his concurring opinion in <u>People v. Thomas</u> (1953) 41 Cal.2d 470 at page 480. This formulation is known as the Thomas test. (<u>People v. Knoller</u> (2007) 41 Cal.4th 139, 151-152 (<u>Knoller</u>) [explaining the background of and naming of the two tests]; <u>Nieto Benitez</u>, supra, 4 Cal.4th at pp. 103–104; e.g., <u>People v. Poddar</u> (1974) 10 Cal.3d 750, 756–757 [using the Thomas test], overruled on another point in <u>People v. Saille</u> (1991) 54 Cal.3d 1103, 1113–1114.)  Under it, the physical component of implied malice requires the commission of an act that *involves a high probability of death.*

The court's instruction is based on the formulation articulated in <u>Phillips</u>, supra, 64 Cal.2d at page 587 and is known as the <u>Phillips</u> test.  (<u>Knoller</u>, <u>supra</u>, 41 Cal.4th at pp. 151–152; <u>Nieto Benitez</u>, <u>supra</u>, 4 Cal.4th at pp. 103–104; e.g., <u>People v. Sedeno</u> (1974) 10 Cal.3d 703, 719 [using <u>Phillips</u> test], <u>overruled or disapproved on other grounds in</u> <u>People v. Blakeley</u> (2000) 23 Cal.4th 82, 89; <u>People v. Breverman</u>, <u>supra</u>, 19 Cal.4th 142, 163, fn. 10; and <u>People v. Flannel</u> (1979) 25 Cal.3d 668, 684, fn. 12.)  Under that test, the physical component of implied malice requires the commission of an act *whose natural consequences are dangerous to life.*

As the Attorney General points out, the California Supreme Court considers both formulations to be essentially correct articulations of the applicable standard, including the physical component.  (<u>Nieto Benitez</u>, <u>supra</u>, 4 Cal.4th at p. 111; <u>People v. Dellinger</u> (1989) 49 Cal.3d 1212, 1217–1221; <u>Watson</u>, supra, 30 Cal.3d 290, 300; <u>People v. Curtis</u> (1994) 30 Cal.App.4th 1337, 1353; <u>People v. Cleaves</u> (1991) 229 Cal.App.3d 367, 378; <u>People v. McCarnes</u> (1986) 179 Cal.App.3d 525, 530–531.)  Moreover, although the two tests are both deemed correct, the Supreme Court has expressly stated its preference for the more direct and straightforward language of the <u>Phillips</u> test.  (<u>Knoller</u>, <u>supra</u>, 41 Cal.4th at p. 152.)

Although a trial court's duty to deliver a

---

[9]Section 188 provides, in relevant part, that malice "is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

*requested* instruction is greater than its obligation to instruct sua sponte, the court may properly refuse requested instructions that are redundant, repetitious, argumentative, or potentially misleading or that are simply elaborations on general instructions on matters that are adequately covered by other instructions. (People v. Bolden (2002) 29 Cal.4th 515, 556–559; People v. Gurule (2002) 28 Cal.4th 557, 659; People v. Sanders (1995) 11 Cal.4th 475, 560; People v. Wright (1988) 45 Cal.3d 1126, 1134; People v. Thongvily (1998) 62 Cal.App.4th 71, 82; People v. La Fargue (1983) 147 Cal.App.3d 878, 886.)

Given the legal equivalency of the Thomas and Phillips tests and the Supreme Court's preference for the Phillips test, we conclude that the trial court properly declined to give [Petitioner's] proposed instruction either instead of the standard instruction or in addition to the standard instruction. Indeed, giving both could have confused and misled the jury.

[Petitioner's] claim of error is based on the observation by Justice Mosk in his concurring opinion in Nieto Benitez, supra, 4 Cal.4th at pages 112–115. In his concurrence, Justice Mosk agreed with the majority that the Phillips test correctly defined implied malice and that the Phillips instruction was not defective in omitting the "'high probability of death'" language of the Thomas test. However, Justice Mosk opined that the "high probability" language better described the physical component of implied malice. (Id. at pp. 112, 115.) Moreover, he was concerned that in certain cases, it might be harder for jurors to understand the "conscious disregard" language than the "'high probability of death'" language because the former is more abstract and technical, which, in turn, might cause jurors to misconstrue and misapply the applicable standard and cloud their ability to discern whether the facts warrant a murder conviction. (Id. at p. 114 & fn. 3.)

Justice Mosk explained that although "there was no such likelihood here, in another case a reasonable likelihood may arise. Consider a situation in which, in a remote part of a rural county, a hunter, for no apparent reason, fired a bullet into the air at a 45-degree angle, causing a human death on the ground some distance away. The act was illegal because it 'could result in injury or death' [citation], and was somewhat dangerous even though performed in a thinly populated area. But let us further hypothesize that death as a result was a freak occurrence: there was uncontested evidence that the bullet was far more likely to strike the ground or a tree than a human being. There was no high probability that the act would result in death; the act's natural consequences were not dangerous to human life. But the

'natural consequences dangerous to life' language is vague enough to those unschooled in the nuances of the law of homicide that a lay jury might nevertheless vote to convict the hunter of implied-malice murder.  If a reviewing court concluded there was a reasonable likelihood the jury misconstrued the instruction, the judgment of conviction would be reversed. []  Under the previous versions of those instructions – which gave the high probability language [citation] – the jury would readily understand the task it faced, for the language was forthright and clear." (Id. at pp. 114–115.)

[Petitioner's] reliance on Justice Mosk's discussion is misplaced.  As noted, Justice Mosk was concerned that there could be situations where jurors might find implied malice under the broad, technical, and abstract "conscious disregard" language where they would not have so found under the clearer, high-probability-of-death language.

Such a concern does not reasonably arise in this case because the circumstances of [Petitioner's] conduct are so different from the freakish hypothetical scenario imagined by Justice Mosk, in which a jury might misunderstand and misapply the concept of implied malice.  Instead of shooting a rifle into the air in a remote rural area, defendant recklessly sped down the freeway for miles under the influence of alcohol and marijuana, wildly weaving from left to right, driving on and off the freeway, and narrowly missing cars as he passed them.  In our view, the "conscious disregard" language of the standard instruction is not so technical and abstract that it might have clouded the jurors' ability to discern whether the facts warranted a murder conviction.  Nor do we find that without the "high probability of death" language, jurors might have misunderstood, misconstrued, or misapplied the criminal act element of implied malice.  Indeed, given [Petitioner's] conduct, we find no reasonable possibility that a juror might find implied malice under the Phillips test but not under the Thomas test, that is, found that the natural consequences of [Petitioner's] reckless drunk driving were dangerous to human life but not find that his dangerous driving involved a high probability of death.[10]  This is especially so because here the jury found that [Petitioner] drove with gross negligence, which required a finding that he drove in a reckless way that

---

[10]For this reason, we would find any error in rejecting [Petitioner's] proposed instruction to be harmless. (People v. Watson, supra, 46 Cal.2d at p. 836.)

United States District Court

For the Northern District of California

1    created "a high risk of death, or great bodily injury."[11]

2  Doc. #32 at 26–30.

3          a.      Standard

4          It is well established that a criminal defendant is entitled to adequate

5  instructions on the defense theory of the case.  Conde v. Henry, 198 F.3d 734, 739

6  (9th Cir. 2000).  Failure to instruct on the theory of defense violates due process if

7  "'the theory is legally sound and evidence in the case makes it applicable.'"  Clark v.

8  Brown, 450 F.3d 898, 904–05 (9th Cir. 2006) (quoting Beardslee v. Woodford, 358

9  F.3d 560, 577 (9th Cir. 2004)).  However, the defendant is not entitled to have jury

10  instructions raised in his or her precise terms where the given instructions

11  adequately embody the defense theory.  United States v. Del Muro, 87 F.3d 1078,

12  1081 (9th Cir. 1996).  A state trial court's refusal to give an instruction does not

13  alone raise a ground cognizable in federal habeas proceedings.  See Dunckhurst v.

14  Deeds, 859 F.2d 110, 114 (9th Cir. 1988).  The error must so infect the trial that the

15  Petitioner was deprived of the fair trial guaranteed by the Fourteenth Amendment.

16  See id.   An examination of the record is required to see precisely what was given

17  and what was refused and whether the given instructions adequately embodied the

18  Petitioner's defense theory.  United States v. Tsinnijinnie, 601 F.2d 1035, 1040 (9th

19  Cir. 1979).

20          b.      Analysis

21          Petitioner argues that the trial court erred in using the standard instruction,

22  CALCRIM No. 520, instead of, or in addition to, his proposed instruction on implied

23  malice.  Petitioner's proposed instruction required a finding that the defendant

24  "committed an act that involves *a high probability that [the act] will result in*

25

26          [11][Petitioner] also relies on two law journal articles that favor the Thomas test
over the Phillips test. (Hobson, Reforming California's Homicide Law (1996) 23
27  Pepperdine L.Rev. 495; Mounts, Malice Aforethought in California: A History of
Legislative Abdication and Judicial Vacillation (1999) 33 U.S.F. L.Rev. 313.)
28  However, his discussion of those articles does not convince us that our analysis in
incorrect or that the court erred in rejecting his proposed instruction.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*death*." Doc. #32 at 26.  CALCRIM No. 520 required a finding that the defendant committed an act where "*the natural and probable consequences of the act were dangerous to human life* . . ." Id.  Petitioner argues that only the "high probability" phrasing properly quantifies the degree of risk; under the "natural consequences" phrasing, even a slight possibility of danger would require a finding of implied malice.  Doc. #1–2 at 26.  Petitioner alleges that the evidence was reasonably close and that if the jury had been given his proposed implied malice instruction, the jury could have reasonably found that he committed gross vehicular manslaughter while intoxicated but did not commit murder with implied malice.  Id. at 27.

To the extent that Petitioner challenges the implied malice instruction as an error under state law, that claim is not cognizable in federal habeas.  Estelle, 502 U.S. at 71–72.  The question is whether the failure to give Petitioner's implied malice instruction so infected the trial that the Petitioner was deprived of the fair trial guaranteed by the Fourteenth Amendment.  Dunckhurst, 859 F.2d at 114.  The state appellate court's rejection of this claim was not unreasonable under AEDPA. The state appellate court reasonably found that CALCRIM No. 520 alone adequately embodied the defense theory that Petitioner should not be found guilty of second degree murder if there was only a slight possibility that Petitioner's reckless driving was likely to result in death.  The state appellate court also reasonably concluded that the possibility of confusion was unlikely in Petitioner's case where the record indicated that the natural consequences of Petitioner's reckless driving was both danger to human life and a high probability of death.  Doc. #32 at 30.  Specifically, witnesses testified that Petitioner drove at high speeds for 17 miles, during which time he swerved from side to side, hit a temporary road sign, and narrowly missed other cars.  There is no reasonable likelihood that any juror found Petitioner guilty of murder based on evidence that showed a low risk to human life.  The trial court's failure to give the requested instruction did not deprive Petitioner of the fair trial guaranteed by the Fourteenth Amendment.  Accordingly, the Court must deny

1   Petitioner habeas relief on his claim that the trial court erred in refusing to give his

2   proposed instruction.

3       4.    Sentencing Error

4       Petitioner also argues that the trial court erred in imposing the upper term for

5   driving while intoxicated.  The state appellate court rejected his claim as follows:

> [Petitioner] contends that the court violated his right to a jury trial by imposing an upper term for count 5 – driving while intoxicated, in violation of Vehicle Code section 23153 – based on its own factfinding rather than on facts found by the jury beyond a reasonable doubt or admitted by [Petitioner] himself.
>
> In Apprendi v. New Jersey (2000) 530 U.S. 466, the United States Supreme court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crimes beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt."  (Id. at p. 490; accord, Blakely v. Washington (2004) 542 U.S. 296, 301 [applying Apprendi rule to sentencing scheme that gave court discretion to impose elevated sentences based its own findings].)  In Cunningham v. California (2007) 549 U.S. 270 (Cunningham), the United States Supreme Court held that California's Determinate Sentencing Law (DSL) violated the Sixth Amendment right to a jury trial insofar as it authorized a trial court, and not the jury, to find facts that exposed the defendant to an elevated upper term sentence.  (Id. at pp. 292–293.)
>
> In imposing the upper term, the trial court stated, "As to Count Five, the [Vehicle Code section] 23153, driving while intoxicated with injury, the driving simply could not have been anymore [sic] egregious or horrible, or dangerous.  The driving itself is an aggravating factor that outweighs any other factor, any other consideration. The Court selects the upper term of three years in state prison."
>
> [Petitioner] asserts that the court's finding that [Petitioner]'s driving could not have been more "egregious," "horrible," and "dangerous" does not correspond to any finding by the jury or any of the aggravating sentencing factors enumerated in the California Rules of Court.  (See Cal. Rules of Court, rule 4.421 [circumstances in aggravation].)
>
> As [Petitioner] acknowledges, the enumerated list of aggravating factors is not exclusive, and the court may rely on other criteria as long as it expressly identifies them at sentencing on the record.  (Cal. Rules

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1
2
3
4
5

of Court, rule 4.408.)  Driving under the influence and causing injury does not require that one drive in a reckless or even dangerous or negligent manner.  Thus, where one commits that offense by driving in a particularly egregious, horrible, reckless, and dangerous way, the manner of driving reasonably may be considered an aggravating circumstance that warrants an elevated term.  In our view, this was the factual basis for the court's sentencing choice.[12]

6
7
8
9
10
11
12
13

The Attorney General argues that "[s]ince the jury found [Petitioner] guilty of murder, gross vehicular manslaughter while intoxicated and leaving the scene, driving under the influence of drugs or alcohol and causing injury, driving with a blood alcohol level of 0.08 percent and more with injury, and hit and run resulting in permanent serious injury, it necessarily believed the horrified and frightened citizens who had the misfortune of witnessing [Petitioner] drive drunk on the highway.... [] Thus, the aggravating circumstances that [Petitioner's] driving 'simply could not have been anymore egregious or horrible, or dangerous' was inherent in the jury's verdict of guilt on count 5 and fully satisfied the requirement in Cunningham."

14
15
16
17
18

The jury's verdict reflects findings of implied malice – i.e., that [Petitioner] drove his vehicle in a way that was dangerous to human life and with conscious disregard for human life – gross negligence – i.e., that he drive in a reckless way that created a high risk of death or great bodily injury and was indifferent to the consequences.  When viewed in light of the evidence of how [Petitioner] drove, the jury's findings reasonably encompass a finding that [Petitioner's] driving was particularly egregious, horrible, and dangerous.

19
20
21
22

However, even if we agree with [Petitioner] that the jury was not asked to make such a finding and its verdict did not implicitly include that finding, the imposition of an aggravated term based solely on the court's own findings would not compel reversal and a remand for resentencing.

23
24

The imposition of an aggravated term in violation of Cunningham does not compel reversal if the reviewing court "concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt

25

26
27
28

[12]Although the court opined that [Petitioner's] driving "could not have been any more" egregious, horrible, or dangerous, we do not read that statement literally as a qualitative finding that he could not have driven any worse then he did. Obviously, he could have been even more reckless and caused even more damage, injury, and/or death.  Rather, we understand the court's determination to be that [Petitioner's] driving was particularly egregious, horrible, and dangerous.

United States District Court

For the Northern District of California

1
2
3

standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury...." (<u>People v. Sandoval</u> (2007) 41 Cal.4th 825, 839.)

4
5
6

Given the undisputed evidence concerning [Petitioner's] driving, we have no reasonable doubt that a jury would have found true beyond a reasonable doubt an allegation that [Petitioner's] driving was particularly egregious, horrible, and dangerous.  Accordingly, any <u>Cunningham</u> error was harmless.

7    Doc. #32 at 34–36.

8                    a.    <u>Standard</u>

9    "[A]ny fact that increases the penalty for a crime beyond the prescribed

10  statutory maximum must be submitted to a jury, and proved beyond a reasonable

11  doubt."  <u>Apprendi v New Jersey</u>, 530 U.S. 466, 525 (2000).  The "statutory

12  maximum" for <u>Apprendi</u> purposes is the maximum sentence a judge could impose

13  based solely on the facts reflected in the jury verdict or admitted by the defendant;

14  that is, that the judge could impose without any additional findings.  <u>Blakely v.</u>

15  <u>Washington</u>, 542 U.S. 296, 303–04  (2004); <u>accord</u> <u>Rita v. United States</u>, 551 U.S.

16  338, 352–53 (2007).  This means that the "the middle term prescribed in California's

17  statutes, not the upper term, is the relevant statutory maximum."  <u>Cunningham v.</u>

18  <u>California</u>, 549 U.S. 270, 288 (2007).  Failure to submit a sentencing factor to the

19  jury, like failure to submit an element to the jury, is not structural error; therefore, it

20  is subject to harmless-error analysis.  <u>Washington v. Recuenco</u>, 548 U.S. 212,

21  221–22 (2006).   Applying <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), the  Court

22  must determine whether "the error had a substantial and injurious effect" on

23  Petitioner's sentence.  <u>Hoffman v. Arave</u>, 236 F.3d 523, 540 (9th Cir. 2001) (internal

24  quotation marks omitted).  Under that standard, the Court must grant relief if it is in

25  "grave doubt" as to whether a jury would have found the relevant aggravating

26  factors beyond a reasonable doubt.  <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995).

27  Grave doubt exists when, "in the judge's mind, the matter is so evenly balanced that

28  he feels himself in virtual equipoise as to the harmlessness of the error."  <u>Id.</u> at 435.

1

b.     Analysis

2          Applying the above legal principles to Petitioner's claim of sentencing error,

3    the Court concludes that the state appellate court's conclusion that the error was

4    harmless was not unreasonable under AEDPA.  The aggravating factor was

5    reasonably assumed to be encompassed within the jury's findings.  The jurors were

6    instructed that in order to find Petitioner guilty of gross vehicular manslaughter

7    while intoxicated, they must find that, among other things, Petitioner committed the

8    misdemeanor with "gross negligence" which caused the death of another person.

9    Doc. #28 at 2522.  The jury was further instructed that

10

11           [a] person acts with gross negligence when, one, he or she acts in a reckless
             way that creates a high risk of death, or great bodily injury; and, two, a
12           reasonable person would have known that acting that way would create such a
             risk.  In other words, a person acts with gross negligence when . . . his or her
             acts amounts to a disregard for human life or indifference to the consequences
13           of that act.

14   Id. at 2523.  The jury's finding that Petitioner was guilty of gross vehicular

15   manslaughter while intoxicated required a finding that he was driving in a reckless

16   way that created a high risk of death, which is reasonably considered egregious,

17   horrible and dangerous driving.

18          Furthermore, sufficient evidence exists in the record to support a conclusion

19   that a jury would have found the relevant aggravating factor beyond a reasonable

20   doubt.  Various witnesses testified that Petitioner was driving over 80 m.p.h.,

21   swerving between lanes and forcing other cars to the shoulder; that Petitioner drove

22   up an embankment, backed down and re-entered the freeway going even faster; and

23   that Petitioner hit a temporary road sign, scraped a car, and narrowly missed hitting

24   other cars.  Petitioner also hit the victim's minivan with such force that the minivan

25   skidded, rolled over and ejected three of the five passengers.  The force was so great

26   that Petitioner's car rolled across the freeway and through a fence and landed upside

27   down.  On such evidence, the Court does not have "grave doubts" whether the jury

28   would have found the aggravating factor that the Petitioner's driving was egregious,

horrible, and dangerous.  The failure to submit this sentencing factor to the jury was, at most, harmless error under <u>Brecht</u>.  <u>Washington</u>, 548 U.S. at 221–22.

Accordingly, the Court must deny Petitioner habeas relief on his sentencing claim.

### CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.

The clerk shall terminate any pending motions as moot, enter judgment in favor of Respondent and close the file.

SO ORDERED.

DATED: ___May 14, 2012___



EDWARD J. DAVILA
United States District Judge

United States District Court
For the Northern District of California